UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kenneth M. Comeau

v.                                          Civil No. 12-cv-478-JL
                                            Opinion No. 2013 DNH 145
Carolyn W. Colvin, Acting
Commissioner, Social Security
Administration


**MEMORANDUM ORDER**

Kenneth M. Comeau has appealed the Social Security Administration's denial of his applications for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI").  An administrative law judge at the SSA ("ALJ") ruled that, despite Comeau's severe impairments (including major depressive disorder, panic disorder, and post-traumatic stress disorder), he retains the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy, and, as a result, is not disabled.  See 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Appeals Council later denied Comeau's request for review of the ALJ's decision, see id. §§ 404.968(a), 416.1479, so the ALJ's decision became the SSA's final decision on Comeau's application, see id. §§ 404.981, 416.1481.  Comeau appealed the decision to this court, which has jurisdiction under 42 U.S.C. § 405(g) (Social Security).

Comeau has filed a motion to reverse the decision.  See L.R. 9.1(b)(1).  He argues that the ALJ made three errors:  (1) giving great weight to the opinions of a state agency psychologist who had never treated Comeau, while giving little weight to the opinions of a psychiatrist who had, (2) finding that Comeau's complaints of his symptoms were not fully credible, and (3) due to those errors, asking a vocational expert ("VE") to opine as to Comeau's employability based on a mistaken view of his ability to interact with other people.

The Commissioner of the SSA has cross-moved for an order affirming the ALJ's decision.  See L.R. 9.1(d).  The Commissioner argues that:  (1) the ALJ supportably chose to credit the relevant opinions of the state agency pyschologist, rather than the treating psychiatrist, (2) the ALJ also supportably chose not to fully credit Comeau's relevant complaints, and (3) as a result, the ALJ's hypothetical question to the VE expressed a supportable view of Comeau's ability to interact with others.  As explained fully below, the court agrees with the Commissioner, and therefore grants his motion to affirm (and denies Comeau's motion to reverse) the ALJ's decision.

## I.    **Applicable legal standard**

"Judicial review of a Social Security claim is limited to determining whether the ALJ used the proper legal standards and

found facts upon the proper quantum of evidence." Ward v. Comm'r of Social Security, 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)).  If the ALJ's factual findings were supported by "substantial evidence," they are "conclusive," even if the court disagrees with the ALJ, and even if other evidence supports a contrary conclusion.  42 U.S.C. § 405(g); see also, e.g., Nguyen, 172 F.3d at 35.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Becker v. Sec'y of Health & Human Servs., 895 F.2d 34, 36 (1st Cir. 1990) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

     That standard is not, however, "merely [a] rubber stamp [of] the ALJ's decision." Scott v. Barnhart, 297 F.3d 589, 593 (7th Cir. 2002) (quotation and bracketing omitted).  If the ALJ's decision was based on "a legal or factual error," or otherwise unsupported by substantial evidence, then it must be reversed and remanded under § 405(g).  Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996); see also, e.g., Johnson, 597 F.3d at 411; Nguyen, 172 F.3d at 35 (noting that an ALJ's findings are not conclusive where they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts").

## II.  **Background**

Comeau, who was 30 years old at the outset of his claimed disability, lives in his mother's house with four of his children under the age of 15 (a fifth child lives with that child's mother).  Comeau's mother normally takes care of the household chores, as well as getting the children off to school in the morning.  Comeau also makes no payment toward the household expenses.  He has held five different jobs in his life, one of them for 18 months and the others for less than a year each.  In August 2009, he was fired from his last job, as a picker in a warehouse, after five months.

In April 2010, Comeau was hospitalized for several days after suffering respiratory failure due to an asthma attack and becoming unresponsive.  In a visit to his primary care doctor two months or so later, Comeau reported feeling "some emotional fall-out" from the hospitalization.  Comeau also announced that he was applying for disability benefits due to his severe asthma.  After retaining counsel, Comeau in fact filed an application with the SSA in June 2010, seeking both disability insurance benefits and supplemental security income.  Comeau claimed to have been disabled as of August 3, 2009, the last time he worked.

For purposes of his application, Comeau underwent a comprehensive psychological examination, conducted in September

4

2010 by Dr. Lawrence Jasper.  Jasper diagnosed Comeau with post-
traumatic stress disorder ("PTSD"), as well as amnestic disorder
due to his recent episode of respiratory failure.  So far as the
record indicates, Comeau had no prior history of any mental or
psychological problems.  In relevant part, Jasper opined that
Comeau was unable to "interact appropriately and communicate
effectively" with "friends, landlord [sic], fellow employees or
supervisors," but capable of doing so with "family members and
neighbors."  Jasper cautioned, however, that Comeau was "highly
disengaged at this time, so that behavioral ratings are
difficult."

A pyschiatrist for the State of New Hampshire, Dr. Laura
Landerman, later assessed Comeau's mental impairments by
reviewing his medical records for the period beginning in
February 2010 (two months or so before his hospitalization) and
ending in September 2010, after his examination by Jasper.
Landerman concluded, in relevant part, that Comeau suffered from
moderate limitations in understanding, remembering, and carrying
out detailed instructions, as well as in completing a normal work
week without interruptions and performing at a consistent pace
without unreasonable periods of rest, and in responding
appropriately to changes in the work setting.  Landerman also
opined, however, that Comeau was "not significantly limited" in

any other category of understanding and memory, concentration and
persistence, adaptation or social interaction--including the
ability to "interact appropriately with the general public," "ask
simple questions or request assistance," "accept instructions and
respond appropriately to criticism from supervisors," and "get
along with coworkers or peers."

In October 2010, the SSA informed Comeau that it had denied
his application, deeming him "capable of full time work with
environmental limitations . . . due to [his] asthma," noting that
he "retain[ed] the ability to remember locations and work-like
procedures, maintain attention and concentrate for extended
periods of time," as well as "to maintain a schedule and
accommodate to changes in a work setting."  Through counsel,
Comeau sought a hearing on his application before an ALJ.

Comeau subsequently visited the Greater Nashua Mental Health
Center, where he underwent an initial assessment by Rachel Mong,
a clinician, on December 10, 2010.  Mong observed that Comeau
"displayed anxiety and depression," but that his "intellectual
functioning was average, and he was fully oriented with good
memory, adequate insight, and adequate judgment."  Comeau went on
to attend monthly therapy sessions with Mong from December 2010
through February 2011.  During these sessions, Comeau reported

increased symptoms of anxiety, including mood swings, interrupted
sleep, and nightmares.

Dr. Phillip Santora, a psychiatrist at the Greater Nashua
Mental Health Center, completed a psychiatric evaluation of
Comeau in March 2011.  Comeau reported nightmares and flashbacks
of his episode of respiratory failure, as well as panic attacks,
and presented with a depressed and anxious mood and affect.
Santora observed, however, that Comeau's "thinking process was
clear and coherent; his immediate, recent, and past memory were
reasonably good . . . ; his attention span was fair; and his
insight and judgment were fair and at times good."  Santora
diagnosed Comeau with major depressive order, PTSD, and panic
disorder, and prescribed anti-depressant and anti-anxiety
medications.  When Santora next saw Comeau, in April 2011, he was
still depressed and anxious, but his "recent and remote memory
were good, as were his attention span and concentration."

Comeau had three more therapy sessions with Mong, on April
29, May 13, and May 27, 2011.  During the May 2011 sessions,
Comeau expressed worry over "being on his own" during a vacation
his mother had taken, since "his mother tends to take care of
him, and he is not expected to do much around the house."

On June 24, 2011, Santora (the psychiatrist at the Greater
Nashua Health Clinic) completed a "Psychiatric Evaluation" form

7

on Comeau.  Consistent with his initial diagnosis, Santora wrote
that Comeau suffered from major depressive disorder, PTSD, and
panic disorder without agoraphobia.  In a "functional evaluation"
part of the form, Santora indicated that Comeau suffered from
functional limitations in several areas, including:

> • marked difficulty in certain daily living activities
> (shopping, using public transportation, and initiating
> and participating in activities independent of
> supervision or direction);
>
> • marked difficulty in certain areas of maintaining
> social functioning (interacting and actively
> participating in group activities and holding a job);
> and
>
> • deficiencies in task performance and concentration
> (completing tasks in a timely manner, and assuming
> increased mental demands associated with competitive
> work).

Santora indicated these limitations by checking blanks next to
certain activities listed on the form.  Significantly, Santora
did _not_ check the blanks used to indicate marked difficulties in
communicating clearly and effectively; cooperating with others
(including co-workers); responding to those in authority
(including supervisors); or responding without fear to strangers.

On the next page, entitled "Psychiatry," Santora estimated
that Comeau had a "moderately severe" degree of impairment in his
ability to relate to other people and restriction of daily

activities and interests.[1]  Santora also opined that Comeau had

at least a fair ability to, on a sustained basis, comprehend and

follow instructions, perform work requiring either frequent or

minimal contact with others, and perform simple, complex,

repetitive, and varied tasks.  Santora also noted that Comeau had

a mild memory defect.  Finally, asked "what degree of improvement

can reasonable [*sic*] be anticipated in the patient's condition,"

Santora wrote, "too early to tell--only seen twice but expect

long term improvement with cont'd meds [and] counselling."

    An ALJ held a hearing on Comeau's claim on September 23,

2011.  Comeau and the VE were the only witnesses.  Under

examination by his counsel, Comeau testified that he did not

---

[1]Comeau states that, on this form, the term "moderately
severe" was "defined as marked and severe."  That is incorrect.
While "functional evaluation" page of the form defines "marked"
as "a degree of restriction which is more than moderate but less
than extreme or total," no definition of "moderately severe" is
given, either on that page or the following one, which is where
the term appears.  And "moderately severe" cannot mean the same
thing as "severe," because the form requires a choice among those
two terms (as well as "none," "mild," and "moderate").  It should
also be noted that, in defining both affective and anxiety
disorders, the Social Security regulations use the term "marked,"
rather than the term "moderately severe" (which the listings do
not use).  20 C.F.R. § 404, Subpt. P, App. 1, Pt. A, §§ 12.04.B,
12.06.B.  It is at best unclear, then, precisely what the term
"moderately severe," as it appears on the form, means--including
whether it means "marked" as Comeau suggests.  But, even if it
does, that makes no difference to the outcome here, because, as
discussed in detail below, the ALJ did not err in giving little
weight to Santora's opinion that Comeau had a "moderately severe"
limitation in his ability to interact with others.

think he could work full-time because he has "a hard time leaving his house" and "being in public settings."  Comeau related that, since his episode of respiratory failure, "when [he] would go out in public places [he] would get so overwhelmed, [he] would have to leave."  He said that, aside from attending his doctors' appointments, he left his home only "maybe once a week" to visit his brother's house.  Comeau described his typical day as divided among watching TV, using Facebook, listening to music, and sitting on his back porch, though he said he occasionally did routine household chores like dishes or the laundry.

As noted at the outset, the ALJ found that Comeau suffered from several severe impairments, see 20 C.F.R. §§ 404.1520(c), 416.920(c), i.e., asthma, major depressive disorder, panic disorder, and PTSD, but that these impairments, either alone or in combination, did not meet or exceed any listed impairment, see id. §§ 404.1520(d), 416.920(d).  The ALJ found that Comeau retained the RFC to do light work, see 20 C.F.R. §§ 404.1567(b), 416.967(b), limited, in relevant part, "to work involving simple, routine, repetitive . . . tasks.  Additionally [he] has moderate limitations in his ability to interact appropriately with the public, co-workers, and supervisors" (footnote omitted).  While Comeau's restrictions left him unable to perform his past relevant work, see id. §§ 404.1565, 416.965, the ALJ found that,

considering Comeau's age, work experience, and RFC, there are
jobs that exist in significant numbers in the national economy
that he can perform, see id. §§ 404.1569, 416.969.  Specifically,
the VE testified that, based on those factors, Comeau could
perform the requirements of occupations like hotel housekeeper,
office mail clerk, or office helper.  So the ALJ ruled that
Comeau was not disabled.  See id. §§ 404.1505(a), 416.905(a).

### III. **Analysis**

Comeau argues that, in assessing his RFC, the ALJ made three
errors.  First, Comeau charges, the ALJ improperly rejected
Santora's opinions in favor of Landeman's on the subject of
Comeau's limitations, even though (a) Santora was in a treating
relationship with Comeau, while Landerman never even examined
him, and (b) Landerman's opinion failed to account for the
records of Comeau's treatment and evaluation at the Greater
Nashua Health Clinic, which did not even begin until after
Landerman had completed her evaluation.  Second, Comeau argues
that the ALJ improperly rejected, as not fully credible, Comeau's
complaints about the limiting effects of his symptoms.  Third,
Comeau argues that, in light of these errors, the ALJ asked the
VE a hypothetical question about Comeau's employability that
inaccurately "downgraded" his limitations.  The court will
address these arguments in turn.

11

A.    **Medical opinion testimony**

In attacking the ALJ's ruling that Comeau is not disabled, Comeau focuses on the ALJ's decision to give "little weight" to Santora's opinions.  This aspect of the ALJ's decision, however, had a limited effect on her assessment of Comeau's RFC.  In fact, the ALJ's finding that Comeau was "limited to work involving simple, routine, repetitive . . . tasks" is consistent with Santora's opinion that Comeau has a fair ability to comprehend and follow instructions, perform work requiring either frequent or minimal contact with others, and perform complex, repetitive, and varied tasks (as well as a good ability to perform simple tasks).  Comeau does not argue to the contrary.

Indeed, so far as Comeau suggests, or this court can discern, the ALJ's findings on Comeau's limitations departed from Santora's opinions on just one point:  Comeau's ability to interact with others.  Specifically, while Santora opined that Comeau suffered from a "moderately severe" degree of impairment in his ability to relate to other people, the ALJ found that Comeau has only "moderate limitations in his ability to interact appropriately with the public, co-workers, and supervisors."  In passing upon the ALJ's weighing of Santora's opinions, then, this court need decide only whether the ALJ properly rejected Santora's finding that Comeau has a "moderately severe" degree of

impairment in relating to others and found, instead, that Comeau
has only "moderate limitations" in that ability.  As explained
below, the ALJ made no legal error in coming to that conclusion,
which was supported by substantial evidence.

"If [the ALJ] find[s] that a treating source's opinion on
the issue(s) of the nature and the severity of [the claimant's]
impairment(s) is well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in [his] case record, [the ALJ]
will give it controlling weight."  20 C.F.R. § 416.927(c)(2); see
also id. § 404.1527(c)(2).  While Santora is a "treating source,"
the ALJ did not give "controlling weight" to his opinion as to
Comeau's ability to interact with others, because, among other
reasons, Santora's "assessments are not supported by [his]
treatment notes or the remaining medical evidence of record, and
. . . were based on only two visits."  The ALJ's approach thus
"appear[s] entirely in accord with § 416.927(c) which, again,
requires an ALJ to give controlling weight to a treating source's
opinions only insofar as they are 'well-supported.'"  Santiago v.
Astrue, 2013 DNH 048, 8.

In challenging the ALJ's finding that Santora's opinions
lacked support, Comeau charges that the ALJ "ignore[d] Dr.
Santora's extensive familiarity with [him] due not only to his

13

own treatment of him, but due to the counselling notes" of
Comeau's sessions with Mong which, in Comeau's eyes, serve to
"bolster[]" Santora's opinion.  But Comeau does not point to
anything in Mong's notes of those sessions that supports
Santora's conclusion that Comeau faced a "moderately severe"
degree of impairment--or, for that matter, any degree of
impairment--in his ability to relate to others.

Comeau further argues that the opinions of Jasper, the
psychologist who examined him in connection with his application
for disability benefits, also provided support for Santora's
conclusions.  Jasper had deemed Comeau unable to "interact
appropriately and communicate effectively" with "friends,
landlord, fellow employees or supervisors"--but capable of doing
so with "family members and neighbors."  As an initial matter,
then, Jasper's opinion does not completely support Santora's
broader view that Comeau suffered from a "moderately severe"
impairment in his "ability to relate to other people" at large.
In any event, the ALJ expressly gave "little weight" to Jasper's
opinion that Comeau was "significantly limited in his activities
of daily living" (a category that includes interaction with
others) because, among other reasons, it was "inconsistent with
objective clinical findings."

14

In challenging this conclusion, Comeau does not point to any objective clinical findings that, in fact, demonstrate his inability to interact with "friends, landlord, fellow employees, or supervisors," as Jasper opined.  Instead, Comeau argues that "[i]t is the role of medical experts, not the ALJ to evaluate functional capacity, using the data like reported daily activities and observed capacities."  In fact, "the final responsibility for deciding" the issue of residual functional capacity belongs to the ALJ.  20 C.F.R. § 416.927(d)(2); see also id. § 404.1527(d)(2).[2]  In reaching that decision, moreover, the ALJ must weigh opinions from medical sources according to a number of factors, such as whether an opinion has "relevant evidence to support [it], including medical signs and laboratory findings."  Id. § 416.927(c)(3); see also id. § 404.1527(c)(3).  The ALJ did not err in relying on the absence of such data in

---

[2]It is true, as Comeau points out, that "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person."  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 17 (1st Cir. 1996) (quotation formatting omitted).  As discussed infra, however, the record before the ALJ did contain a medical opinion that--contrary to what Santora had found--Comeau did not face "moderately severe" limitations in his ability to interact with others, namely, Landerman's opinion that Comeau was "not significantly limited" in any area of social interaction.  In light of that opinion, and the ALJ's indication that she gave it great weight, Comeau's repeated accusations that the ALJ determined his RFC merely by "interpret[ing] raw medical data" are clearly misplaced.

giving little weight to Jasper's opinion that Comeau was
incapable of effectively and appropriately interacting with
friends, landlords, fellow employees, or supervisors.

Comeau does not identify anything else in his medical
records to support Santora's opinion that Comeau faced a
"moderately severe" impairment in interacting with others--aside
from Jasper's opinions and Mong's treatment notes.  But, for the
reasons just discussed, the ALJ did not err in finding that those
materials did not in fact support Santora's opinion.  It follows
that the ALJ did not err in finding that opinion unsupported by
the medical evidence of record and, as a result, not entitled to
controlling weight.  See id. § 416.927(c)(2); see also id.
§ 404.1527(c)(2).

Despite that finding, of course, the ALJ was nevertheless
required to evaluate Santora's opinion in light of the factors
specified by §§ 404.1527(c) and 416.927(c) in deciding what
weight to give it, as well as to "give good reasons" for that
decision.  Id.  The ALJ did so.  First, the ALJ observed that
Santora's opinions were "based on only two visits."  While Comeau
objects to that reasoning, "[l]ength of the treatment
relationship and the frequency of examination" are expressly
listed among the factors the ALJ must consider in deciding the
weight to give the opinions of a medical source.  Id.

16

§§ 404.1527(c)(2)(i), 416.927(c)(2)(i).  Santora himself made an issue of his brief relationship with Comeau, qualifying his prognosis with "too early to tell--only seen twice."  It would be strange indeed if the ALJ could not rely on the very same observation in giving little weight to Santora's opinions.

Second, the ALJ observed that Santora's opinion was "not supported by [his] treatment notes."  In assessing a medical opinion, as already discussed, the ALJ considers the degree of "relevant evidence to support it," id. § 404.1527(c)(2)(i); see also 416.927(c)(2)(i), and, as also already discussed, Comeau has not pointed to anything in Santora's treatment notes that supports his opinion that his patient faced a "moderately severe" impairment when interacting with others.  If anything, Santora's findings were to the contrary.  While he found that Comeau had "marked limitations" in "actively participating in group activities," Santora specifically did not find that Comeau had any such degree of limitation in communicating clearly and effectively; cooperating with others (including co-workers); responding to those in authority (including supervisors); or responding without fear to strangers.[3]  Santora's report makes no

---

[3]These negative findings also dispose of Comeau's argument that the opinions of Jasper, on one hand, and Santora, on the other, "are congruent and reinforcing" (at least on the relevant point, i.e., Comeau's ability to interact with others).  Again, while Santora noted no marked limitations in Comeau's ability to

17

effort to reconcile these findings with his conclusion that Comeau nevertheless faced "moderately severe" limitations in interacting with others.  The ALJ did not err, then, in giving that conclusion little weight.

Comeau also assails the ALJ's decision to give "great weight" to the opinions of Landerman, the state agency psychiatrist who reviewed his records.  Landerman concluded, in relevant part, that Comeau was "not significantly limited" in the ability to "interact appropriately with the general public," "ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from supervisors," and "get along with coworkers or peers."  Comeau complains that Landerman reached this conclusion even though "[s]he did not have all the records from [Greater] Nashua Mental Health [Center] . . . or Dr. Santora's report" (a temporal inevitability, of course, since Comeau did not visit that clinic--or seek mental health treatment from any source--until after Landerman rendered her opinion, and the SSA relied on it in initially denying Comeau's claim).

As already discussed, however, Comeau has identified nothing in those records that supports Santora's view of Comeau's

---

communicate and cooperate with others, including co-workers and supervisors, Jasper opined that Comeau was in fact unable to interact or communicate appropriately or effectively with fellow employees or supervisors (among others).  Those opinions are contradictory, not "congruent."

difficulty in interacting with others.  That crucial fact serves
to distinguish this case from Swanburg v. Astrue, 2012 DNH 071
(Barbadoro, J.), on which Comeau heavily relies.  There, Judge
Barbadoro reversed an ALJ's decision to rely on the opinions of
state agency consultants as to the claimant's RFC, observing that
an ALJ cannot do so if such opinions "are based on an incomplete
record, when later evidence supports the claimant's limitations."
Id. at 17.  Here, again, the records generated after Landerman
reached her opinions as to Comeau's social functioning contain no
"evidence" of his limitations in that area--aside from Santora's
opinion that those limitations are "moderately severe," which is
not only unsupported, but facially inconsistent with the balance
of his findings, as just discussed.  Unlike in Swanburg, then,
the fact that Landerman "did not have the benefit of the treating
provider's notes and opinions or the opportunity to explain [her]
reasons for discounting them," id. at 18, does not undermine
those opinions, or the ALJ's decision to place weight on them
rather than Santora's unsupported opinion to the contrary.

     As this court has recognized, an ALJ can rely "exclusively
on the assessments of non-testifying, non-examining physicians"
in adjudicating a claimant's RFC, and conflicts between those
assessments and other medical testimony "are for the ALJ to
resolve."  Morin v. Astrue, 2011 DNH 091, 9-10 (citing Berrios

Lopez v. Sec'y of HHS, 951 F.2d 427, 431-32 (1st Cir. 1991) and
Tremblay v. Sec'y of HHS, 676 F.2d 11, 12 (1st Cir. 1982)).
Furthermore, "[t]he ALJ decision to resolve that conflict against
the claimant should be affirmed if "'that conclusion has
substantial support in the record.'" Id. (quoting Tremblay, 676
F.2d at 12).  For the reasons just discussed, substantial
evidence supports the ALJ's decision to rely on Landerman's
opinion that Comeau was not significantly limited in any area of
social interaction, rather than Santora's opinion that Comeau had
a "moderately severe" limitation in his ability to interact with
other people, and to find, accordingly, that Comeau had at worst
"moderate limitations in his ability to interact appropriately
with the public, co-workers, and supervisors."  Indeed, Santora
himself--whose opinions Comeau so vigorously defends on this
appeal--specifically found that Comeau had no marked limitations
in communicating clearly and effectively; cooperating with others
(including co-workers); responding to those in authority
(including supervisors); or responding without fear to strangers.

   **B.   Comeau's credibility**

   Comeau argues that the ALJ also erred in assessing Comeau's
statements as to his "isolative symptoms," in particular, that he
"specifically avoids . . . contacts" with "the outside world."
As Comeau notes, an ALJ must evaluate such statements according

to SSR 96-7p, Titles II and XVI: Evaluation of Symptoms in
Disability Claims: Assessing the Credibility of an Individual's
Statements, 1996 WL 374186 (S.S.A. 1996).  SSR 96-7p "outlines a
specific staged inquiry that consists of the following questions,
in the following order:  (1) does the claimant have an underlying
impairment that could produce the symptoms he or she claims?; (2)
if so, are the claimant's statements about his or her symptoms
substantiated by objective medical evidence?; and (3) if not, are
the claimant's statements about those symptoms credible?"
Griffiths v. Astrue, No. 11-cv-195, 2012 WL 1565395 at *9 (D.N.H.
Apr. 3, 2012) (citations omitted), rept. & rec. adopted, 2012 WL
1557846 (D.N.H. May 2, 2012).

    Here, the ALJ found that Comeau had impairments that could
produce his claimed symptoms, including "social isolation," but
that "the medical record" did not support that claim.  As already
discussed at length, Comeau has not pointed to anything in his
medical records where he reported difficulty in interacting with
his fellow man, or other forms of "social isolation."  Again,
Jasper deemed Comeau unable to interact with "friends, landlord,
fellow employees, or supervisors," but the ALJ rejected that
opinion as "inconsistent with objective clinical findings."  As
also already discussed at length, Comeau has not pointed to any
such findings, and Santora subsequently reached a contrary

21

conclusion, in any event.  The ALJ supportably found, then, that Comeau's medical records did not support his claimed "social isolation."  See, e.g., Widlund v. Astrue, No. 11-cv-371, 2012 WL 1676990, at *16 (D.N.H. Apr. 16, 2012) (McCafferty, M.J.), rept. & rec. adopted, 2012 WL 1676984 (D.N.H. May 14, 2012).

The ALJ also supportably found that Comeau's allegations of "social isolation" were not credible.  As already noted, Comeau testified at the hearing that he gets "so overwhelmed" in "public places" that he has "to leave the store . . . or go sit out in the car," with the result that he "does not go a lot of places."  Comeau testified that he does not do the grocery shopping--his mother does--and that he leaves his house "maybe once a week," to go to his "brother's house for a little bit."  The ALJ noted Comeau's testimony that he has "difficulty with social settings, which can cause panic attacks," but found his "allegations regarding his daily activities not fully credible," because, among other things, "when [his] mother went away on vacation for a few weeks, [he] was responsible for daily activities in the household.  There is nothing in the medical record that indicates [he] was afraid that he could not complete those activities, only a concern that he had to."

Of course, "[o]ne strong indication of the credibility of an individual's statements is their consistency . . . with other

information in the case record." SSR 96-7p, 1996 WL 374186, at *5. Comeau points to nothing in his medical records--which include notes of two different sessions with Mong in May 2011, while his mother was away on vacation--suggesting that, in her absence, his "social isolation" left him unable to handle the affairs of his household, including the grocery shopping his mother normally handles (which would almost certainly have been a necessary chore for a family of five, including four school-aged children, at some point during his mother's three-week vacation).

In attacking this reasoning, Comeau argues that, simply "because [he] took care of himself for a few weeks in May, 2011 when his mother was away," the ALJ could not have "determined he had adequately demonstrated [activities of daily living] commensurate with the ability to work."  The ALJ, however, did not rely on evidence of Comeau's ability to care for himself while his mother was away as the basis for her ultimate conclusion that Comeau had the "ability to work" (i.e., was not disabled).  To the contrary, she relied on that evidence as the basis for her finding that his allegations of "social isolation" were not fully credible.  That was proper.  Indeed, "'[w]hile a claimant's performance of household chores or the like ought not to be equated to an ability to participate effectively in the work force, evidence of daily activities can support a negative

23

credibility finding.'" Mason v. Astrue, 2013 DNH 013, 14
(McAuliffe, J.) (quoting Teixeira v. Astrue, 755 F. Supp. 2d 340,
347 (D. Mass. 2010)).

The bottom line is that, aside from Jasper's unsupported
opinions, Comeau has pointed to nothing in his medical records to
corroborate his claimed inability to go out in public--and that
Santora, the very medical source whose views Comeau argues the
ALJ should have adopted, found Comeau to have no marked
limitations in, among other areas of social functioning,
responding without fear to strangers.  Based on this record, the
ALJ did not err in rejecting Comeau's complaint of "isolative
symptoms" as less than fully credible.

###    C.    Hypothetical question

Finally, Comeau argues that the ALJ erred by basing her
hypothetical question to the VE on a "downgraded" version of
Comeau's limitations.  Specifically, Comeau complains that this
hypothetical "assigned [him] a series of moderate limitations
[in] interacting with the public, coworkers, [and] supervisors,"
even though "Drs. Santora and Jasper had placed [these] at the
serious level."  Again, though, Santora specifically did not find
that Comeau had marked limitations in, among other areas,
cooperating with others (including co-workers), responding to

those in authority (including supervisors), and responding without fear to strangers.

In any event, as to Comeau's social interaction abilities, the ALJ rejected the opinions of Santora and Jasper insofar as they were inconsistent with those of Landerman.  And Landerman opined that Comeau faced no significant limitation in any of those abilities, including to "interact appropriately with the general public," "ask simple questions or request assistance," "accept instructions and respond appropriately to criticism from supervisors," and "get along with coworkers or peers."  As already discussed, the ALJ did not err in crediting Landerman's opinions on that subject.  See Part III.A, supra.  It follows that the ALJ also did not err in posing a hypothetical question to the VE that assumed only "moderate limitations" in the employee's ability to interact with the public, coworkers, and superiors.  See, e.g., Canales-Rivera v. Sec'y of HHS, 961 F.2d 1565 (table), 1992 WL 98326, at *1 (1st Cir. May 12, 1992) (unpublished disposition).

## IV.   Conclusion

For the foregoing reasons, Comeau's motion to reverse the ALJ's decision[4] is DENIED, and the Commissioner's motion to affirm that decision[5] is GRANTED.  <u>See</u> 42 U.S.C. § 405(g).  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  November 1, 2013

cc:  Ronald B. Eskin, Esq.
     T. David Plourde, AUSA

---

[4]Document no. 9.

[5]Document no. 10.

26